# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| IN RE EXTRADITION OF KASHIF KHAN | ) Case No. |
| | ) 6:24-mj- 1859 |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   August 15, 2024   in the county of   Orange   in the
  Middle   District of   Florida   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 3184 | Fugitive from foreign country to United States |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Amanda S. Daniels, Assistant United States Attorney
*Printed name and title*

Sworn to before me over the telephone or reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: August 15, 2024

*Judge's signature*

City and state:   Orlando, Florida      EMBRY J. KIDD, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| THE EXTRADITION OF ) | Case No. 6:24-mj - 1859 |
| ) | |
| KASHIF KHAN ) | |

COMPLAINT FOR PROVISIONAL ARREST
WITH A VIEW TOWARDS EXTRADITION
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to Canada.

2. There is an extradition treaty in force between the United States and Canada.[1]

3. The Treaty provides in Article 11 for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents.

4. In accordance with Article 11 of the Treaty, the Government of Canada has asked the United States for the provisional arrest of Kashif Khan ("Khan") with

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), *and* Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively, the "Treaty").

1

a view toward his extradition.

5.  According to the information provided by the Government of Canada, Khan is wanted for prosecution for one count of Fraud Over $5,000 in violation of section 380(1)(a) of the Canadian Criminal Code ("the CCC"), one count of Conspiracy to Commit an Indictable Offence in violation of section 465(1)(c) of the CCC, and one count of Laundering Proceeds of Crime in violation of section 462.31(1)(a) of the CCC.

6.  These offenses were committed within the jurisdiction of Canada. On May 16, 2023, Justice of the Peace Joanna Opalinski of the Ontario Court of Justice, Toronto, Ontario, Canda issued a warrant for Khan's arrest.

7.  Canada seeks Khan's provisional arrest with a view toward his extradition based on the following facts:

  a.  On March 18, 2022, Matthew Wilkins ("Wilkins"), Vice President of Human Resources and Business Operations at Westbank Holdings ("Westbank") filed a criminal complaint with the Toronto Police Service ("TPS") alleging Khan, as well as other conspirators, had defrauded Westbank and its subsidiary, 180 University Management ("180 Management"), in the amount of 6,044,722.68 CAD (approximately 4,647,182.80 USD).

  b. Wilkins alleged that Khan had authorized and paid co-conspirators on invoices for work and materials they had not provided. All invoices were related to Westbank's and 180 Management's development, construction, and management of

building services for the Shangri-La Toronto ("Shangri-La"), a mixed-use property comprising a hotel, retail spaces, and residential condominium complex. Westbank subsequently provided TPS with numerous documents related to the suspected fraud, including Corporation Profile Reports for companies suspected of participating in the fraud, fraudulent invoices, and all negotiated checks and deposit account details for the companies suspected of fraud.

Khan's Role at Westbank

c.      Khan joined Westbank in March 2016 as a senior member of the Westbank Engineering Group ("Engineering Group"), which was tasked with dealing with building systems and the shared areas and services between the hotel and condominium complex at the Shangri-La. In October 2016, Khan was promoted to Chief of the Engineering Group. In that role, Khan oversaw and arranged subcontractors to perform work and supply materials for the Shangri-La. Khan was responsible for negotiating subcontractors' fees and for supervising and approving the subcontractors' work and materials. Khan also approved invoices remitted by subcontractors and directed payments to them.

Khan's Suspected Role in the Fraudulent Scheme

d.      In approximately mid-January 2022, Steve Fujiwara ("Fujiwara"), Vice President of Accounting and Compliance at Westbank, received two anonymous phone calls advising him that an unnamed company was remitting fraudulent invoices and being paid for work and materials not provided to the Shangri-La.

Westbank reported this information to TPS and began an internal investigation. Evidence from this internal investigation showed that between February 1, 2017, and January 31, 2022, Khan, along with co-conspirators at five companies, orchestrated a fraud scheme by which Khan authorized and paid invoices to the companies for non-existent services or materials.

 e. During Westbank's internal investigation, Stanley Chan ("Chan"), Westbank's VP-Head of Property Management, compared the suspected invoices with security access logs, and visited the Shangri-La with two members of the Engineering Group, who had both worked with Khan. The employees, Tej Singh ("Singh") and Eucel Talisic ("Talisic"), examined each location at the Shangri-La where work was alleged to have been performed or materials were to have been provided. Neither man had any knowledge of the fraudulent invoices nor were they aware of the suspect companies completing any work or providing any materials referred to in the invoices. The men also indicated that they would have known and remembered the work and materials quoted in the invoices.

 f. The internal investigation also revealed Khan's efforts to perpetuate the fraudulent scheme even after moving to the United States and resigning from Westbank. In June 2020, Khan informed Westbank that he would need to relocate to the United States to care for his ailing mother. For a time, Khan continued to work part-time for Westbank, and he traveled to Toronto periodically. In August 2021, Khan resigned from Westbank; however, Westbank allowed him to continue

approving invoices, without compensation, from August 2021 until January 2022, on the agreement that he would provide support and training to his successor, Henry Palma ("Palma").

g. Khan used his retained access to Westbank to continue defrauding Westbank. According to Chan, he and Palma reviewed suspected invoices that Khan issued between August 2021 and January 2022, when Khan was living in the United States and training Palma. Palma stated that he had no knowledge or recollection of the work or materials quoted by the suspected companies in the fraudulent invoices. Palma further indicated that he would have been aware of the quoted work or materials allegedly provided by these companies had the invoices been genuine.

<u>Khan's Receipt of Fraudulently Obtained Money</u>

h. After issuing payment on the fraudulent invoices, Khan received part of the proceeds from his co-conspirators. Bank records for each account to which Khan issued invoice payments show subsequent transfers to various bank accounts controlled by Khan. Approximately 2,957,121 CAD (approximately 2,273,434 USD) has been traced to Khan's various bank accounts. Transaction records for Khan's accounts further shows that he used this money to exchange currency in the foreign exchange market and for various personal expenses, including on credit card, mortgage, and tax payments.

i. Khan also received cash payments from co-conspirators, in an apparent effort to disguise the illegal nature of the funds. For example, based on statements

provided by one of Khan's co-conspirators, Mila Kornilov ("Kornilov"), the money was passed through multiple individuals and accounts before reaching Khan. A review of bank records for Kornilov's company, show that between February 1, 2017, and January 31, 2022, the company received payment on 42 invoices from 180 Management for a total of 1,269,832 CAD (approximately 976,246 USD). The account then shows checks and e-transfers to Zenon Junko ("Junko"), between September 1, 2017, and December 31, 2021, totaling $765,687.84.

  j. Kornilov was interviewed during a civil case brought by Westbank related to the fraud. In those proceedings, Kornilov explained that Junko is her ex-boyfriend, and she conspired with him to launder the money she received from Khan via 180 management. According to Kornilov, she transferred money to Junko and he would return the money to her in cash, while keeping ten percent for himself. After receiving these payments from Junko, Kornilov paid Khan in cash. Kornilov's statements were corroborated by excel spreadsheets she produced to Westbank's civil counsel identifying payments to Junko.

  k. On September 15, 2023, Palma met with TPS and identified Khan from two profile photos taken from Khan's publicly viewable WhatsApp account. Westbank knows this WhatsApp account to be associated with Khan based on his involvement in the civil litigation related to this matter, and that he used it to communicate with Kornilov and others.

  8. The offenses for which Khan's provisional arrest and extradition are

sought are provided for in Article 2 of the Treaty.

9. Khan may be found within the jurisdiction of this Court. The U.S. Marshals Service determined, with the assistance of Canadian law enforcement, that Khan is currently residing in Orlando, Florida, where he has been physically observed.

10. The Government of Canada has represented that it will submit a formal request for extradition supported by the documents specified in the Treaty within the time required under the Treaty.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Canada.

_____
Amanda S. Daniels
Assistant United States Attorney

Affidavit submitted by email and attested to me as true and accurate via telephone or video conference, consistent with Fed. R. Crim. P. 4.1 and 4(d)(3), before me this 15th day of August, 2024.

_____
EMBRY J. KIDD
United States Magistrate Judge

7